CAMILLA COTTON OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12549.   Filed December 19, 1958.

*Waldo DeLoache, Esq.*, and *R. Lamar Moore, Esq.*, for the petitioner.

*Lester R. Uretz, Esq.*, and *Jack D. Yarbrough, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies, additions to tax, and an overassessment in petitioner's income tax, declared value excess-profits tax, and excess profits tax for the fiscal year ended June 30, 1943, as follows:

#### INCOME TAX

| Year ended | Deficiency | Additions to tax under sec. 293 (b) [1] | Overassessment |
|---|---|---|---|
| June 30, 1943 | None | None | $68. 43 |

#### DECLARED VALUE EXCESS-PROFITS TAX

| June 30, 1943 | $39, 446. 44 | $19, 723. 22 |
|---|---|---|

#### EXCESS PROFITS TAX

| June 30, 1943 | $220, 836. 01 | $110, 418. 01 |
|---|---|---|

[1] All stationery references are to the Code of 1939, unless otherwise noted.

Respondent concedes that $143,625.55 of the additional rental income determined to be due petitioner from the C. S. Carter Shelling Plant for the fiscal year ended June 30, 1943, is not accruable income in that year. Respondent concedes, on brief, that the amount of $8,351.43, representing sales in 1941 by the C. S. Carter Shelling Plant, was erroneously included as income to petitioner in 1942, if the Court finds that the shelling plant's books were kept on an accrual basis of accounting. Respondent further concedes that there is no addition to tax under section 293 (b) due from petitioner for the taxable year in issue. Respondent also concedes that petitioner sustained a net operating loss in its taxable year ended June 30, 1945, in the amount of $35,936.16, which is available as a carryback to the taxable year ended June 30, 1943.

The issues presented for decision are: (1) Whether petitioner understated its rental income for the taxable year ended June 30, 1943, and, (2) whether petitioner is entitled to a deduction in the above year for an accrued repair expense.

The findings of fact and opinion with respect to each issue will be discussed separately.

##### FINDINGS OF FACT.

Some of the facts have been stipulated and, to the extent so stipulated, are incorporated herein by this reference.

### Issue 1.

Camilla Cotton Oil Company (hereinafter referred to as petitioner or Camilla) is a corporation organized on July 19, 1924, and existing under the laws of the State of Georgia, the petitioners for the charter being George M. Perry, Leon Perry, and C. S. Carter. On February 18, 1944, the charter, originally granted for a period of 20 years, was amended and renewed under the State's corporation acts of 1938. It filed a corporation income tax return and a corporation excess profits tax return for the taxable year ended June 30, 1943, with the collector of internal revenue for the district of Georgia.

The initial capitalization was $5,000. The capitalization and the outstanding stock were increased to $50,000 on May 31, 1934. Thereafter, until Carter's death on June 15, 1943, the shareholders were as follows:

|  | Shares |
| --- | --- |
| George M. Perry | 333. 34 |
| C. S. Carter | 166. 66 |
| Total | 500. 00 |

C. S. Carter was the president of petitioner until his death on June 15, 1943, and George M. Perry was vice president, secretary, and treasurer. After the death of C. S. Carter, George M. Perry

became president and treasurer and T. B. Twitty, Jr., became vice president and secretary of Camilla.

Petitioner commenced operations on or about September 19, 1924, when the corporation bought a cottonseed-crushing plant at Camilla, Georgia, from Central Oil and Fertilizer Company of Macon, Georgia. The cost of $50,000 was paid in 10 installments of $5,000 each. In 1937, petitioner purchased a peanut-shelling plant at Camilla, Georgia, from Columbian Peanut Company. In 1942, pecan-shelling machinery was also installed.

Petitioner crushes cottonseed, peanuts, and soybeans and sells the derivative, oils and meal. It kept its books and filed its income tax return for the year in issue on an accrual basis of accounting.

Petitioner leased its shelling plant to C. S. Carter from February 10, 1937, until his death on June 15, 1943. Initially there was a fixed rental, but under the provisions of a later agreement, one-half of the shelling plant's net profit for the calendar year 1942 was payable to petitioner as rent. The original lease and later agreement, which incorporated the lease by reference, provided that the net profit shall be determined and paid as of a particular date in each year, and that the books should be examined by a public accountant each year. Charles J. Metz had been this accountant and he prepared the statement from which the rental for the year in question was determined.

C. S. Carter operated the shelling plant as a proprietorship until the date of his death, d/b/a C. S. Carter Shelling Plant. He was also engaged in other substantial enterprises, including a mule business and the operation of large farms, planting several hundred acres of peanuts, and raising and grazing substantial numbers of cattle and hogs. Carter's 1942 income tax return did not disclose in any manner these other business enterprises. The business of the shelling plant consisted of buying peanuts which it shelled and then sold to food processors. Pecans were added to its line in 1943. Prior to 1943, George M. Perry had no interest in the income of the shelling plant other than as the principal stockholder of Camilla, to whom rental was paid by the shelling plant. Prior to the death of C. S. Carter, there was an oral agreement between him and George M. Perry that the latter was to receive one-half of the net profits of the shelling plant for his services after rental to Camilla had been paid. The heirs of C. S. Carter ratified this agreement.

During the calendar year 1942, George M. Perry assisted C. S. Carter in the operation of the C. S. Carter Shelling Plant. Perry made most of the sales through brokers, signed correspondence as manager of the shelling plant, and signed expense checks drawn on the shelling plant's checking account at the Planters and Citizens Bank, Camilla, Georgia.

The books and records of petitioner, C. S. Carter Shelling Plant, and East Coast Trading Company, Inc., were all maintained in the office of petitioner. T. B. Twitty, Jr., who had been employed by Camilla for approximately 32 years, maintained the books and records of petitioner and East Coast Trading Company. He assisted C. S. Carter in maintaining the books and records of the shelling plant.

East Coast Trading Company, Inc., Camilla, Georgia, was incorporated under the laws of the State of Georgia on July 8, 1941. At all times during the years 1942 and 1943 its stock was held as follows:

| Stockholder | Number of shares | Amount |
|---|---|---|
| George M. Perry | 6 | $600 |
| Mrs. George M. Perry | 2 | 200 |
| T. B. Twitty, Jr | 2 | 200 |
| Total | 10 | 1,000 |

During the years 1942 and 1943, George M. Perry was president, secretary, and treasurer, and T. B. Twitty, Jr., was vice president of the East Coast Trading Company, Inc.

The major portion of the income of the East Coast Trading Company, Inc., during 1942 and 1943 was from the sale of shelled peanuts. It purchased peanuts from the C. S. Carter Shelling Plant and resold them in the Chicago market. It also sold cottonseed meal and soybean meal purchased from petitioner. There were other purchases and sales from and to others, and some income was derived from the operation of two trucks.

C. S. Carter was born on June 27, 1889, at Bluffton, Georgia. He lived at Camilla, Georgia, from 1915 until his death on June 15, 1943.

The tax returns of petitioner for the taxable year ended June 30, 1943, were prepared by C. J. Metz, a public accountant, from information supplied to him by T. B. Twitty, Jr.

The individual income tax return of C. S. Carter for the calendar year 1942 was prepared by C. J. Metz from information supplied to him by Carter.

The profit and loss statement of the C. S. Carter Shelling Plant for the period ending December 31, 1942, was prepared by C. J. Metz. Metz did not make a complete audit of the books of the shelling plant. The trial balance for this period was prepared by T. B. Twitty, Jr.

C. S. Carter, in his 1942 income tax return, attached a schedule relating to the profit and loss of the shelling plant which indicated a net profit of $12,873.52. Included in expenses on this schedule was this same amount under the heading of "Rent."

In its corporation income tax return for the taxable year ended June 30, 1943, petitioner reported gross rentals from the C. S. Carter

Shelling Plant in the amount of $12,873.52, less $28 for proper charges, or a net of $12,845.52.

At the end of the calendar year 1942, and the taxable year ended June 30, 1943, the respective books of the C. S. Carter Shelling Plant and Camilla were in balance.

During the year 1944, the respondent's agents began an investigation of the income tax return of C. S. Carter for the period ending with his death on June 15, 1943, the tax returns of petitioner for the fiscal year ended June 30, 1943, and the income tax return of George M. Perry for the calendar year 1943. The investigation was later extended to include the return of Perry for the year 1942, the return of C. S. Carter for the year 1942, and the returns of the East Coast Trading Company, Inc., for the years 1942 and 1943. In the course of their investigation, respondent's agents asked to see the books of the C. S. Carter Shelling Plant for the calendar year 1942 and for the period ended June 15, 1942. They were informed by George M. Perry that he did not know what had become of the shelling plant's books and records. T. B. Twitty, Jr., also stated that he did not know what had become of the books and records, but that in the fall of 1943 he and a few employees had been cleaning out the record room where they kept their old records and it was possible that they had inadvertently picked up the books of the shelling plant for the year 1942, and period ending with the death of C. S. Carter, and burned them.

The only other records of the shelling plant for the year 1942 furnished to the examining officers were bank deposit tickets, some bank statements, canceled checks covering a period of approximately 5 months, and copies of about 10 per cent of the sales invoices. The income of the shelling plant for 1942 could not be determined from the records furnished respondent's agents by Perry and Twitty.

In the absence of adequate books and records, the examining agents reconstructed the income of the shelling plant for the year 1942 by an examination of bank records, railroad shipping records, trucking company shipping records, brokers' records, records of customers, and other available records. As a result of this method of reconstructing the income of the shelling plant in 1942, respondent determined that petitioner failed to report additional rental income in the amount of $301,360.08.[2]

Four persons had access to the customers' checks of the C. S. Carter Shelling Plant. They were C. S. Carter, George M. Perry, T. B. Twitty, Jr., and Mrs. Sheffield, the office secretary. Perry and Carter conducted the business of the shelling plant, the petitioner, and the East Coast Trading Company from the offices of Camilla. They oc-

---

[2] This is the amount determined by respondent in the statutory notice of deficiency and does not reflect any of the concessions made by respondent at trial or on brief.

cupied opposite sides of a large desk in a private office, while Twitty and Mrs. Sheffield had desk space in an outer office open to the public. No one had the specific duty of handling incoming mail. Any one of the above-named individuals might open it. When checks payable to the shelling plant came in, they were customarily placed on the desk in Perry's and Carter's office.

C. S. Carter, as lessee of petitioner, was acting for himself and not on behalf of petitioner.

At the time petitioner filed its tax return for the period in issue, it did not have knowledge of any additional rental income due it from Carter. Neither Perry nor Twitty had knowledge of any such additional rental income due petitioner from Carter. There was no collusion between Carter and petitioner or any agent of petitioner.

Camilla sustained an operating loss for its taxable year ended June 30, 1945, in the amount of $35,936.16, which is available as a carryback to the fiscal year ended June 30, 1943.

Petitioner did not understate its rental income from C. S. Carter Shelling Plant on its income tax return for the taxable year ended June 30, 1943.

## Issue 2.

In its corporation income tax return for the fiscal year ended June 30, 1943, petitioner deducted the amount of $11,099.38 as repair expenses. Respondent, in his statutory notice of deficiency, determined that petitioner overstated its repair expenses in the amount of $3,391.54.

The amount in issue represents the cost of rebuilding a boiler used by petitioner in its operations. The contract for repairing the boiler was entered into prior to the close of petitioner's fiscal year but the work was not completed until after the close of said year. The work performed on the boiler consisted mainly of replacing grates and rebuilding the brick walls.

The amount accrued on petitioner's books for the work performed on the boiler was not an ordinary and necessary business expense.

### OPINION.

### Issue 1.

The first question for determination is whether petitioner understated its rental income for the taxable year ended June 30, 1943. Resolution of this issue depends upon whether petitioner should have properly accrued its share of the additional net income of the C. S. Carter Shelling Plant, the existence of which was not known to petitioner at the time it filed its returns.

The net income of the shelling plant, as disclosed to petitioner at the close of the calendar year 1942, was $25,747.04. One-half of this

amount or $12,873.52, less allowable charges, was reported as rental income by petitioner on its return for the fiscal year ended June 30, 1943.

Respondent in his statutory notice determined that petitioner understated its rental income for the taxable year ended June 30, 1943, by the amount of $301,360.08. Respondent concedes that $143,625.55 of the additional rental income determined to be due from C. S. Carter Shelling Plant to petitioner for the above year is not accruable income to petitioner in that year.[3] As noted in our preliminary discussion, certain other concessions have been made by respondent concerning the additional unreported income and additions to tax under section 293 (b).

At the outset, it should be noted that the parties are in agreement on the general rules for determining when an item of income is properly accruable.

It is generally stated that an item should be accrued when (1) all the events have occurred which fix the amount of the claim and determine the question of liability; (2) the amount is readily ascertainable; and (3) the liability therefor is determined rather than contingent. The exact amount need not be determined. It is sufficient that all the facts upon which the calculation depends have become fixed. *Lucas* v. *American Code Co.*, 280 U. S. 445 (1930). Then the computation may be unknown, but it is not unknowable. *Frost Lumber Industries* v. *Commissioner*, 128 F. 2d 693 (C. A. 5, 1942). See generally, 2 Mertens, Law of Federal Income Taxation sec. 12.76, pp. 179, 180.

The instant dispute arises over the application of these rules to the factual situation presented.

Respondent's argument is twofold. He states: (1) At the end of 1942, all of the events had occurred which fixed the amount of rental income due petitioner. There was no contingency or unreasonable certainty qualifying the liability of the shelling plant since the liability was fixed by the terms of the lease agreement. (2) The amount due petitioner as rent was readily ascertainable since the books of petitioner, East Coast Trading Company, Inc., and C. S. Carter Shelling Plant were kept in the office of petitioner and both Twitty and Perry were familiar with the operations of the shelling plant.

Petitioner contests both of respondent's assertions as above noted. With respect to the first contention, petitioner admits that the lease agreement fixed the liability but urges that more is needed. It is argued that not only must the liability be fixed, but also determined. It is further urged that in determining whether a claim is disputed

---

[3] The amount of unreported rental income so determined as a result of this concession is $157,734.53. Respondent on brief states the unreported rentals to be $153,558.80. There appears to be an unexplained discrepancy between the amounts noted in respondent's brief and the testimony of the special agent and submitted exhibits. In view of our decision on this issue, the discrepancies are immaterial.

for accrual purposes, an admission of liability in a stated amount is deemed a denial of liability in excess of that amount. Petitioner asserts that when Carter submitted the shelling plant's 1942 statement of net income to petitioner, he impliedly denied liability for any greater amount. Therefore, petitioner concludes, there was in law and fact a dispute between the parties as to any additional income,[4] which dispute prevents accruability.[5] The validity of this contention, on the facts before us, appears highly conjectural. Since we hold in petitioner's favor on other grounds, however (see *infra*), a detailed discussion of the foregoing contention would serve no useful purpose.

We have found as a fact that neither Twitty nor Perry had knowledge of any additional rental income due petitioner from Carter. Since Twitty prepared the trial balance of the shelling plant for the period ended December 31, 1942, which balance was used by the accountant Metz in the computation of net income, the clear inference is that the books of the shelling plant, to Twitty's knowledge, did not reflect the unreported sales.

We think it clear that Carter's knowledge of any additional rental income is not to be imputed to petitioner, since Carter, with respect to the shelling plant, was obviously acting for himself in a manner adverse to the interests of petitioner. Likewise, under the circumstances here presented, Carter's personal knowledge of sales unreported by him as sole proprietor of the shelling plant is not attributable to Camilla. *American National Bank* v. *Miller*, 229 U. S. 517, 521–2 (1913).

It has consistently been held that the propriety of an accrual must be judged by the facts which the taxpayer knew or could reasonably be expected to know at the closing of its books for the taxable year.

In *Country Club Estates, Inc.*, 22 T. C. 1283 (1954), we stated, at page 1294:

it has also been long recognized that income taxes are to be computed on an annual basis and on the basis of facts which the taxpayer knew or could reasonably be expected to know at the end of its taxable year. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359; *Baltimore Transfer Co.*, 8 T. C. 1.

See also 2 Mertens, Law of Federal Income Taxation, *supra*, p. 184.

The Supreme Court recognized this principle in *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290 (1932), wherein the Court said, at page 296:

The case does not fall within the principle that where the liability is undetermined in the tax year the taxpayer is not called upon to accrue any sum (*Lucas* v. *American Code Co.*, 280 U. S. 445), but presents the problem whether the taxpayer had in its own books and accounts data to which it could apply the

---

[4] *Gunderson Bros. Engineering Corp.*, 16 T. C. 118, 126 (1951); *Great Island Holding Corporation*, 5 T. C. 150, 160 (1945); Rev. Rul. 57–105, 1957–1 C. B. 193.
[5] *United States* v. *Safety Car Heating Co.*, 297 U. S. 88 (1936).

calculations required by the statute and ascertain the *quantum* of the award within reasonable limits.

Unlike the situation in *Continental Tie & Lumber Co., supra,* where it was held that the taxpayer's books contained sufficient information from which reasonable calculations of income could be made, Camilla's books and accounts did not disclose the necessary data from which a calculation of additional rental income could be made. The absence of such information on its books was through no fault of Camilla. Even more significant is the fact that Camilla did not know of the existence, much less the amount, of any additional income due it from Carter at the close of its taxable year.

If accrual is not to be required where a taxpayer's books and accounts, through no fault of the taxpayer, fail to supply the data needed to make reasonable calculations, *a fortiorari,* accrual is not to be required when the taxpayer has no knowledge of the underlying obligation or debt due him. Thus, under the circumstances before us, accrual was, for all practical purposes, out of the question in the year in issue.

We think the circumstances in the instant case are analogous in many respects to those which arise in embezzlement cases wherein the issue is the year in which the loss is deductible. The factors of concealment and ultimate discovery are similar. The usual impossibility of accounting for the loss in the year of concealment warrants the application of a practical approach. We think the language of the Supreme Court in *Alison* v. *United States,* 344 U. S. 167 (1952), is as applicable in principle to the facts of the instant case as it was to the special facts before it in *Alison* relating to the year of deduction of embezzlement losses. The Court said, in part (p. 170):

> Whether and when a deductible loss results from an embezzlement is a factual question, a practical one to be decided according to surrounding circumstances. See *Boehm* v. *Commissioner,* 326 U. S. 287. An inflexible rule is not needed; the statute does not compel it. * * *

Applying this practical approach, in principle, to the facts of the instant case, we hold that the rental income in question is not to be deemed to have accrued to petitioner in the year before us. We accordingly hold for petitioner on this issue.

### *Issue 2.*

Petitioner, in its corporate income tax return for the taxable year ended June 30, 1943, claimed deductions in the amount of $11,099.38 as repair expenses. Respondent, in his statutory notice, determined that the repair expenses were overstated in the amount of $3,391.54.

Petitioner contends that the above amount was erroneously disallowed by respondent because it represents the cost of repairing a boiler and furnace needed in the operation of Camilla's business.

Twitty testified that petitioner entered into a contract with an Atlanta firm prior to the close of its fiscal year to have Camilla's boiler rebuilt and that the work was completed on or about August 15, 1943.

We think it clear that petitioner has failed to meet the burden of establishing error in respondent's determination. While Twitty stated that repairs were necessary in each year, it is apparent from his testimony that it was necessary in the year in question to have the boiler rebuilt, and that the expenditure was not for mere repairs. We hold, therefore, that it is not deductible in full as an ordinary and necessary expense but represents a capital expenditure. See *Consumer's Ice & Cold Storage Co.*, 6 B. T. A. 1269 (1927).

*Decision will be entered under Rule 50.*

